

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EQUITY RESIDENTIAL, EQUITY )
RESIDENTIAL PROPERTIES MANAGEMENT )
CORP., EQUITY RESIDENTIAL PROPERTIES )
MANAGEMENT CORP. II, and ERP )
OPERATING LIMITED PARTNERSHIP, )
　 )
　　　　　　Plaintiffs, )
　 )　　No.　04 C 3812
　　　　v. )
　 )　　Judge Robert W. Gettleman
KENDALL RISK MANAGEMENT, INC., )
COBBS, ALLEN & HALL, INC., COBBS, )
ALLEN & HALL OF GEORGIA, INC. )
CHARLES K. ("KENDALL") McEACHERN, )
VERLYN TANKSLEY, and AXIS )
SPECIALTY INSURANCE COMPANY, as )
successor in interest to CONNECTICUT )
SPECIALTY INSURANCE COMPANY, )
　 )
　　　　　　Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Equity Residential, Equity Residential Properties Management Corp., Equity

Residential Properties Management Corp. II, and ERP Operating Limited Partnership filed an

eleven-count second amended complaint against defendants Kendall Risk Management, Inc

("Kendall"), Cobbs, Allen & Hall, Inc. ("Cobbs"), Cobbs, Allen & Hall of Georgia, Inc. ("Cobbs

Georgia"), Charles K. McEachern ("McEachern"), and Verlyn Tanksley ("Tanksley")

(collectively the "Kendall Defendants"), and defendant Axis Speciality Insurance Company, as

1

successor in interest to Connecticut Speciality Insurance Company ("Connecticut Speciality").[1] Plaintiffs allege violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, as well as state law claims for breach of fiduciary duty, civil conspiracy, fraud, unjust enrichment, and negligence against the Kendall Defendants. Plaintiffs also seek a declaration that the Kendall Defendants have a contractual obligation to indemnify plaintiffs. Plaintiffs allege breach of contract against Connecticut Speciality, and seek a declaration that Connecticut Speciality has a duty to defend plaintiffs.

Subject matter jurisdiction of the RICO claims is based on 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), and jurisdiction over the state law claims is based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The Kendall Defendants have moved to dismiss plaintiffs' second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) on a number of grounds, including that plaintiffs' RICO claims are barred in part by a settlement agreement and fail to state a claim upon which relief may be granted. Connecticut Speciality has moved to dismiss plaintiffs' second amended complaint pursuant to 28 U.S.C. § 1367, arguing that the court should decline to exercise supplemental jurisdiction over the state law claims against Connecticut Speciality. Connecticut Speciality has moved, in the alternative, to transfer venue to Florida pursuant to 28 U.S.C. § 1404(a).

For the reasons discussed herein, the Kendall Defendants' motion to dismiss is granted as to the RICO claims, and the court declines to exercise supplemental jurisdiction over the state

---

[1]Connecticut Speciality states that it is incorrectly named, and that the correct entity is Axis Speciality Insurance Company, f/k/a Connecticut Specialty Insurance Company.

2

law claims. Accordingly, the court declines to exercise supplemental jurisdiction over Counts III through IX against the Kendall Defendants, and the court grants Connecticut Speciality's motion to dismiss Counts X and XI. Connecticut Specialty's motion to transfer venue is denied as moot.

## FACTS[2]

Plaintiffs brought this action under civil RICO and several state-law theories to recover damages resulting from the Kendall Defendants' allegedly wrongful conduct in connection with the procurement and termination of an insurance policy issued by defendant Connecticut Speciality. As discussed below, the court reaches the merits of plaintiffs' RICO claims only, and the following facts are those relevant to the consideration of the RICO claims.

Plaintiffs constitute the largest residential real estate investment trust in the country. Directly or through affiliates, plaintiffs have interests in approximately 1,000 multi-family apartment communities with over 200,000 units in 34 states, including Illinois. Plaintiffs have insurance covering many risks, including workers' compensation, property, directors and officers, automobile, employment practices liability, and commercial general liability. Plaintiffs have their principal place of business in Chicago, Illinois.

Defendants Kendall, Cobbs, and Cobbs Georgia provide insurance brokerage, consulting, and risk management services. Cobbs and Kendall were at all relevant times wholly-owned subsidiaries of CAH Holdings, Inc. ("CAH"). Plaintiffs allege that Kendall and Cobbs were affiliates, that Kendall was a "division" of Cobbs, and that Cobbs Georgia a branch of Cobbs.

---

[2]For the purposes of a motion to dismiss, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

McEachern was at all relevant times the president of Kendall, a principal shareholder of CAH, and a licensed insurance broker and consultant in the state of Georgia. Tanksley was at all relevant times branch manager and/or president of Cobbs Georgia, and performed insurance broker services for Cobbs, Cobbs Georgia, and Kendall. Tanksley is a licensed insurance broker in the state of Georgia and reported to McEachern. Defendant Connecticut Speciality is a Connecticut corporation with its principal place of business in Glastonburg, Connecticut.

Relationship between plaintiffs and Kendall

In mid-1996, plaintiffs retained Kendall to procure insurance for plaintiffs and to manage their insurance portfolio. The business relationship between plaintiffs and Kendall expanded over time, and Kendall, McEachern, and their employees effectively served as plaintiffs' "in-house" insurance and risk management department, providing virtually every risk management and insurance service that plaintiffs required. Plaintiffs allege that by the end of 1996, Kendall had "concocted an elaborate scheme" to defraud plaintiffs about the nature of the insurance they were procuring, in order to collect hidden fees and commissions. According to plaintiffs, on several occasions, Kendall misrepresented the actual cost of insurance and accepted commissions from insurance companies from which it procured insurance policies. As a result, a portion of the premiums that plaintiffs paid for these policies actually went to Kendall in the form of commissions, instead of going to the insurance companies as plaintiffs were led to believe. Plaintiffs also assert that Kendall failed to disclose that the brokers it used to purchase the vast majority of plaintiffs' insurance policies - Cobbs and Cobbs Georgia - were affiliates that shared a bank account and parent company with Kendall. Employees were specifically instructed to conceal the common operation and not to list the companies on the same letterhead.

4

According to plaintiffs, Kendall, through McEachern, knew of and arranged for the payment of the secret commissions to Cobbs and Cobbs Georgia. Plaintiffs allege that this scheme continued at least until its discovery by plaintiffs in December 2000, and that it was accomplished through a pattern of mail and wire fraud in which defendants failed to disclose the relationship between Kendall and Cobbs and/or Cobbs Georgia.

Connecticut Policy

In late Fall 1999, plaintiffs authorized Kendall to obtain quotations for general liability insurance for the policy year from December 15, 1999, through December 15, 2000. Kendall, working primarily through Cobbs and/or Cobbs Georgia, received several quotes, including two quotes for three-year programs. Kendall informed plaintiffs, through wire communications, that the Connecticut Speciality policy ("Connecticut Policy") was a three-year prepaid program, with a policy period from December 15, 1999, through December 15, 2002. After discussing all the quotes with Kendall, plaintiffs selected the Connecticut Policy.

According to plaintiffs, Kendall falsely represented through wire communications that the Connecticut Policy could not be cancelled for losses and that the policy would include a 120-day notice of non-renewal provision, rather than the customary 60-day non-renewal provision. Plaintiffs also allege that Kendall failed to inform plaintiffs that unlike their previous commercial general liability programs, the Connecticut Policy included a high-risk pool of hundreds of other insureds, and that Connecticut Specialty could terminate the policy before the expiration of the three-year term if Connecticut Specialty lost its reinsurance treaty, or if the overall pool of insureds experienced large loses. Further, Kendall did not inform plaintiffs that Connecticut

5

Specialty was a "surplus lines, non-admitted carrier" that was not subject to most of the regulations of the Illinois Department of Insurance.

Plaintiffs allege that Kendall steered plaintiffs toward the Connecticut Policy and failed to disclose its risks because the retail broker who would be eligible for a fee was Cobbs or Cobbs Georgia. Kendall did not disclose to plaintiffs until after the coverage was bound that Cobbs or Cobbs Georgia served as the broker on the Connecticut Specialty programs, and plaintiffs allege that Kendall affirmatively misled them by representing that the broker for the Connecticut Policy was an unrelated party. The premium for the three-year Connecticut Policy was \$3,840,611.[3] With Kendall's knowledge and approval, plaintiffs paid Cobbs or Cobbs Georgia a \$150,000 fee for the transaction and other broker services. Plaintiffs claim that unbeknownst to them, Cobbs or Cobbs Georgia also received a 10% commission from the premium. According to plaintiffs, McEachern knew of and arranged for the payment of the commission to Cobbs or Cobbs Georgia. Plaintiffs allege that both the fee and the commission were deposited by Cobbs at the First Commercial Bank of Birmingham, in an account allegedly jointly maintained by Cobbs Georgia, Cobbs, and Kendall.

Plaintiffs further allege that Kendall misrepresented to plaintiffs that Connecticut Specialty required immediate payment of the pre-paid premium in December 1999. In response to Kendall's representation, on December 19, 1999, plaintiffs issued a check for \$3,840,611. Plaintiffs allege that Connecticut Specialty did not require the payment until mid-January 2000, and that Kendall deposited the premium into a Birmingham, Alabama bank account jointly maintained by Kendall and Cobbs or Cobbs Georgia. Plaintiffs allege that the premium remained

---

[3]The court was not provided with a copy of the Connecticut Policy.

6

in the joint account for approximately 30 days, and earned approximately $32,000 in interest, which Kendall, Cobbs, or Cobbs Georgia retained.

In early 2000, problems with the Connecticut Policy began to surface. Plaintiffs allege that neither Cobbs, Cobbs Georgia nor Tanksley reviewed the draft copies of the Connecticut Policy. Plaintiffs claim that the Connecticut Policy contained several errors; most significantly, the policy term was shown as one year, from December 15, 1999, through December 15, 2000. The notice of non-renewal provision was also incorrect. Plaintiffs claim that over the next several months, certain corrections were made, but that the policy term and notice of non-renewal provision remained incorrect. Plaintiffs claim that Kendall and McEachern never informed plaintiffs that they were having problems obtaining policy corrections, and in particular never informed plaintiffs that the Connecticut Policy did not reflect the correct policy period or notice of non-renewal provision.

On September 9, 2000, plaintiffs received notice from Connecticut Specialty that the Connecticut Policy would not be renewed. On September 17, 2000, plaintiffs wrote to Specialty Risk Underwriting Managers, Inc. ("SRU") to protest the action taken by Connecticut Specialty, and plaintiffs expressed their understanding that they had prepaid for a three-year policy. SRU responded to plaintiffs in a letter dated September 29, 2000, and enclosed a copy of the Connecticut Policy, which reflected a policy period from December 15, 1999, through December 15, 2000. SRU explained in its letter that because SRU was unable to retain its reinsurance support, SRU could not renew the Connecticut Policy. SRU did not acknowledge that Connecticut Specialty was obligated to insure plaintiffs through December 15, 2002, noting that the policy documents showed a one-year policy period. Upon termination of the Connecticut

7

Policy in December 2000, plaintiffs were refunded the balance of the premium they had prepaid for the second and third years of the Connecticut Policy period.

After the Connecticut Policy was terminated, plaintiffs were forced to obtain commercial general liability coverage from a different insurer for December 15, 2000, through December 15, 2001. According to plaintiffs, by Fall 2000 the insurance market was less favorable for insureds, and insurers were demanding substantial premium increases. Plaintiffs ultimately purchased two separate year-long replacement policies. According to plaintiffs, both replacement policies had lower premiums than the Connecticut Policy, but had much larger deductibles and lower aggregate coverage limits.

<u>Settlement agreement and general release</u>

Plaintiffs first learned in December 2000, from a third party, that Kendall, Cobbs, Cobbs Georgia, CAH, McEachern, and Tanksley each had conflicts of interest that interfered with their dealings with plaintiffs. Plaintiffs subsequently discovered further misrepresentations, secret commissions and kickbacks. Plaintiffs quickly terminated Kendall and determined that plaintiffs would no longer use Cobbs or Cobbs Georgia as insurance brokers. On or about August 1, 2001, plaintiffs entered into a confidential settlement and general release (the "Settlement Agreement") with Cobbs, Kendall, Cobbs Georgia, and others (the "Settled Defendants"). The Settlement Agreement released "any and all claims" prior to the execution of the agreement against the Settled Defendants (the "Released Claims"), except it reserved all claims "incurred as a result of the procurement and subsequent termination of [plaintiffs'] general liability insurance policy with Connecticut Speciality Insurance Company... ." The Settlement Agreement excluded McEachern and Tanksley, who were not parties to the Settlement Agreement, from the Settled

8

Defendants, and also specifically reserved certain claims against McEachern and Tanksley. Among the claims reserved against McEachern and Tanksley were those based on the Connecticut Policy or intentional acts that would not be deemed errors and omissions under Cobbs's error and omissions insurance policy.[4]

Plaintiffs also entered into a tolling agreement with the Settled Defendants, effective November 12, 2002, which terminated on January 1, 2004. Plaintiffs filed their initial complaint in the instant action on June 3, 2004.

The Yates litigation

On November 25, 2002, a class action lawsuit was filed by current and former tenants of plaintiffs in Florida state court (the "Yates Action"), alleging that certain of plaintiffs' collection practices violate Florida law. The Yates Action sought tens of millions of dollars of damages from plaintiffs during the four years prior to November 25, 2002. Trial in the Yates Action commenced on August 23, 2004, and on December 1, 2004, the trial court awarded the putative Yates class $1,629,380.37 in damages. Final judgment has not yet been entered

Plaintiffs claim that damages related to the claims in the Yates Action, for the period from December 15, 2000, through December 15, 2002, would have been covered under the Connecticut Policy as "advertising injury" without any self-insured retention and subject only to a $2 million per location limit. According to plaintiffs, they will receive significantly less insurance coverage for the Yates Action claims under the replacement general liability policies than they would have if the Connecticut Policy had continued for three years. Plaintiffs are currently engaged in coverage litigation with Connecticut Specialty over its coverage obligations

---

[4]Neither party provided the court with a copy of the Cobbs's insurance policy.

9

for the Yates Action claims. Plaintiffs filed a lawsuit against Connecticut Speciality in the Circuit Cook of Cook County, Illinois on May 11, 2004, seeking a declaratory judgment that Connecticut Specialty must defend plaintiffs in the Yates Action.  See Equity Residential, et al. v. Admiral Ins. Co. et al, No. 04 CH 07746.

## LEGAL STANDARD

In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992).  A claim may be dismissed only if it is beyond doubt that under no set of facts would plaintiff's allegations entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Travel All Over the World, 73 F.3d at 1429-30. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits.  See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

## DISCUSSION

Counts I and II of plaintiffs' second amended complaint allege that the Kendall Defendants violated RICO, 18 U.S.C. §1962(c), and RICO conspiracy, 18 U.S.C. §1962(d), respectively.  The Kendall Defendants argue that plaintiffs' civil RICO claims are barred because they were released by the Settlement Agreement, or in the alternative, fail to plead the predicate acts of mail and wire fraud with the particularity required by Fed. R. Civ. P. 9(b).  For the reasons discussed herein, the court finds that even if plaintiffs were not precluded by the Settlement Agreement from pleading certain allegations, plaintiffs have failed to state a claim

under RICO.[5] Because the court dismisses the RICO counts, which are the only basis of federal jurisdiction, it declines to exercise supplemental jurisdiction over the state-law claims. Accordingly, the court addresses the merits of the RICO claims only.

Neither party comprehensively addresses whether plaintiffs have sufficiently pled a RICO claim, either with or without using the Released Claims to establish pattern. For the purposes of this analysis, the court assumes that plaintiffs are not limited by the Settlement Agreement, and accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiffs. Szumny v. American General Finance, Inc., 246 F.3d 1065, 1067 (7th Cir. 2001).

To state a RICO claim under § 1962(c) or (d), a plaintiff must allege a pattern of racketeering activity. 18 U.S.C. §§ 1962 (c), (d). "Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as the commission of at least two of the predicate acts enumerated in 18

---

[5] Although it need not reach the issue, it appears that the Kendall Defendants are correct in their argument that plaintiffs are precluded from using the Released Claims to plead their RICO claims. The terms of the Settlement Agreement clearly and unambiguously released "any and all claims" against the Settled Defendants based on conduct prior to the Settlement Agreement. See Pierce v. Atchison, Topeka and Santa Fe Ry. Co., 65 F.3d 562, 568 (7th Cir. 1995)("'any and all' language in a release is not ambiguous"). Further, because public policy "favors the peaceful and voluntary resolution of claims," when such resolution has been made, there is a presumption as to the release's validity. Id.(quoting Baylock v. Toledo, Peroria & Western Railroad Co., 356 N.E.2d 639, 641 (Ill. App. 1976)); see also Rissman v. Rissman, 229 F.3d 586, 588 (7th Cir. 2000)("People reach settlements in large measure to buy peace."). Other courts have noted that released claims may not be used to prove RICO claims. See e.g., MCM Partners, Inc. v. Andrew-Bartlett & Associates, Inc., 161 F.3d 443 (7th Cir. 1999)(affirming grant of summary judgment where RICO claims based on conduct before date of release were barred); Divot Golf Corp. v. Citizens Bank of Massachusetts, 2002 WL 31741472, at *4 (D. Mass. Nov. 26, 2002)(noting that "the release would eliminate any pre-existing RICO predicate acts, but several allegations post- date the release"); Williams v. Stone, 923 F. Supp. 689 (E.D. Pa. 1996)(granting the defendants' motion to dismiss where the plaintiffs signed a general release covering the subject matter of the RICO action).

U.S.C. § 1961(1) within a ten year period. Although "precious little" guidance is given in the RICO statute about what constitutes a pattern of activity, courts have expanded upon this requirement, instituting what is referred to as the "continuity plus relationship" test to limit the application of RICO to long-term criminal conduct. Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1022 (7th Cir. 1992). That is, a RICO plaintiff must establish that the predicate acts are related to one another and pose a threat of continued criminal activity. See H.J., Inc., 492 U.S. at 239; Vicom, Inc. v. Hardbridge Merchant Services, Inc., 20 F.3d 771, 779 (7th Cir. 1994).

Plaintiffs in the instant case allege hundreds of predicate acts of mail and wire fraud by the Kendall Defendants within approximately five years, including "mailing phony invoices for services," "mailing hundreds of letters that used misleading letterhead to purposefully conceal the affiliation between Kendall and Cobbs/Cobbs Georgia," and "participating in dozens of false telephone conversations." Plaintiffs have thus sufficiently alleged predicate acts. The question then, is whether plaintiffs have satisfied the "continuity plus relationship test"

It is well-established that when Congress enacted RICO, it was concerned with long-term criminal conduct. H.J., Inc., 492 U.S. at 242; Williams Electronics Games, Inc. v. Barry, 42 F. Supp. 2d 785, 795 (N.D. Ill. 1999). Accordingly, the Supreme Court has cautioned that "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." H.J., Inc., 492 U.S. at 242; see also Miller v. Gain Financial, Inc., 995 F.2d 706 (7th Cir. 1993). This "continuity plus relationship" test "is both a closed- and open-ended concept, in that it refers 'either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1048 (7th Cir. 1998)(quoting H.J., Inc., 492 U.S. at

12

241). Continuity is difficult to define, and the Supreme Court has stated that it is a fact-specific inquiry. H.J., Inc., 492 U.S. at 240. In the more than a decade since the 1989 decision in H.J., Inc., the Seventh Circuit has frequently concluded that the necessary continuity was absent in civil RICO cases. See, e.g., Vicom, 20 F.3d 771; Midwest Grinding, 976 F.2d 1016; see also, Meyer Material Co. v. Mooshol, 188 F. Supp. 2d 936, 941(N.D. Ill. 2002)(collecting Seventh Circuit cases).

In the instant case, plaintiffs do not specify whether they are proceeding under the closed or open theory of continuity, but they argue that the type of fraudulent conduct committed by the Kendall Defendants in connection with the Connecticut Policy was "a regular pattern of doing business and was repeated continuously by [the Kendall Defendants] in procuring other insurance for [plaintiffs] and other clients," which suggests that plaintiffs allege an open-ended scheme. The Kendall Defendants suggest that plaintiffs allege a closed-ended scheme, and cite Harris, which involved a closed-ended scheme. The court considered both methods of demonstrating continuity. For the reasons discussed below, plaintiffs' second amended complaint does not meet the requirements of either the closed-ended or the open-ended types of continuity.

A.     Open-ended continuity

To show open-ended continuity, plaintiffs must demonstrate: (1) a "specific threat of repetition"; (2) that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business"; or (3) that defendants operate a "long term association that exists for criminal purposes." Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1023 (7th Cir. 1992)(quoting H.J., Inc., 492 U.S. at 242-43); see also Vicom, Inc., 20 F.3d at 782. In the instant case, the third scenario does not apply because plaintiff has not alleged that the association among the Kendall

13

defendants "exists for criminal purposes." Plaintiffs do, however, allege that the Kendall Defendants engaged in "a similar pattern of racketeering" with other insureds, and that these activities would have continued as to plaintiffs and other victims had the scheme not been discovered. Plaintiffs fail to establish open-ended continuity under either method.

First, there is no specific threat of repetition in the instant case because plaintiffs allege that after learning of the relationships among the Kendall Defendants, and the secret commissions and kickbacks, plaintiffs "terminated Kendall and determined that Cobbs and/or Cobbs Georgia would never again broker insurance" for plaintiffs. See McDonald v. Schencker, 18 F.3d 491, 497-98 (7th Cir. 1994)(finding that once the defendant was fired, there was no longer any "threat of repetition" for his scheme); Midwest, 976 F.2d at 1025(holding that when defendant resigned, any threat of illegal activity "ceased to exist").

Second, plaintiffs have not sufficiently alleged that defendants' alleged predicate acts are part of an ongoing entity's regular way of doing business. The Supreme Court stated in H.J., Inc. that to demonstrate open-ended continuity the predicate acts must be part of the RICO defendant's "regular way of doing business." 492 U.S. at 242-43. The Seventh Circuit has held that allegations that a RICO defendant defrauded others are subject to the particularity requirements of Fed. R. Civ. P. 9(b), which requires that "the circumstances constituting fraud...shall be stated with particularity." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)("In other words, the plaintiff must plead the 'who, what, when, and where' of the alleged fraud."). The plaintiff in Uni*Quality alleged "upon information and belief" that the defendants defrauded other companies in the same manner in which the plaintiff alleged that it was defrauded. Id. Allegations made on information and belief are insufficient, even if the facts

14

are inaccessible to the plaintiff, unless the plaintiff states the grounds for its suspicions. Id., citing Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 684 (7th Cir. 1992). Uni*Quality affirmed the lower court's dismissal of the plaintiff's RICO claims, noting that the allegations "do not even mention any misrepresentations, much less any specifics about those representations," and thus "do not come close to meeting Rule 9(b)'s particularity requirements." Id.

The reasoning of Uni*Quality applies to the instant case, and plaintiffs' allegations are similarly deficient. Plaintiffs' 244-paragraph second amended complaint contains two paragraphs that allege "on information and belief" that the Kendall Defendants "engaged in a similar pattern of racketeering," with other insureds, one of whom the plaintiffs identify as Lane Realty Management, Corp. Here, plaintiffs fail to provide any details regarding the alleged fraud against other companies, or the basis of their suspicions. The Seventh Circuit has noted that where a plaintiff is alleging fraud against a third party, less detail may be required under Rule 9(b) because the plaintiff may not have access to all the facts necessary to detail his claims. Uni*Quality, 974 F.2d at 92. Even under this relaxed standard, however, the unparticularized allegations in the instant case regarding other putative victims of fraud are insufficient to establish that the predicates acts alleged are a regular part of the Kendall Defendants' ongoing business.

B.    Closed-ended continuity

To demonstrate closed-ended continuity, plaintiffs must "prove a series of related predicates extending over a substantial period of time." See H.J. Inc., 492 U.S. at 242. In Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986), the Seventh Circuit set forth

15

four factors to evaluate in determining whether a RICO pattern has been sufficiently alleged under a closed-ended concept: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. The _Morgan_ court itself stated that the "doctrinal requirement of a pattern of racketeering activity is a standard not a rule...with no one factor being necessarily determinative." _Morgan_, 804 F.2d at 976. Although the Supreme Court's decision in _H.J., Inc._ further refined the proper focus of the continuity component of the pattern requirement, the Seventh Circuit has retained the _Morgan_ test. _See, e.g._, _Vicom_, 20 F.3d at 780 (post-_H.J., Inc._ caselaw has continued to find the _Morgan_ factors helpful); _420 East Ohio Ltd. Partnership v. Cocose_, 980 F.2d 1122, 1124 (7th Cir. 1992)(after _H.J., Inc._, the Seventh Circuit "examines the facts with an eye toward not only the _Morgan_ factors, but also toward the Court's suggestion that continuity encompasses a lengthy period of racketeering activity or a threat of continued criminal activity").

The Seventh Circuit has held that duration is an important aspect of the closed-ended continuity analysis, but that a lengthy scheme alone is not sufficient to demonstrate a pattern. _See, e.g._, _Talbot v. Robert Matthews Distrib. Co._, 961 F.2d 654, 663 (7th Cir. 1992)(no pattern where single scheme occurred over period of years). Plaintiffs' second amended complaint alleges a scheme spanning approximately five years, from 1996 through late 2000 or early 2001. Five years constitutes a "substantial period of time," as required for close-ended continuity, and satisfies the durational component of the first _Morgan_ factor. The period of time over which the predicate acts occur, however, is not the only consideration. The court must also examine the

number and variety of predicate acts. <u>CIB Bank v. Esmail</u>, 2004 WL 3119027, at \*5 (N.D. Ill. Dec. 28, 2004).

Here, plaintiffs' allegations, despite their prolixity, involve multiple, repeated acts of mail and wire fraud only. The Seventh Circuit has indicated that when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive. <u>Midwest Grinding</u>, 976 F.2d at 1024. The Seventh Circuit has noted that mail and wire fraud allegations "are unique among predicate acts" because the multiplicity of such acts "may be no indication of the requisite continuity of the underlying fraudulent activity." <u>Id.</u> (citation omitted). Consequently, the Seventh Circuit does "does not look favorably on relying on many instances of mail and wire fraud to form a pattern." <u>Hartz v. Friedman</u>, 919 F.2d 469, 473 (7th Cir. 1990); <u>see also</u> <u>North American Processing Co. v. Crown Meat Co.</u>, 1994 WL 280082, at \*5 (N.D. Ill. June 17, 1994) ("Were the law otherwise, virtually any commercial dispute could be roped into federal court on the premise that defendants used the mails and telephones.").

Plaintiffs' complaint reveals that each allegation of mail and wire fraud relates back to the overall scheme to receive secret commissions. In <u>Meyer</u>, the court found that the plaintiff's allegations of seventy-two acts of mail fraud and a considerable number of instances of money laundering - all related to a single, five-year scheme to embezzle funds - did not demonstrate continuity. <u>Meyer</u>, 188 F. Supp. 2d at 942. Similarly, the raw number of the communications and invoices and the length of time over which they occurred in the instant case are not necessarily indicative of continuity. Accordingly, the first <u>Morgan</u> factor weighs against continuity despite the duration of the alleged scheme because of the lack of variety of predicate acts, which involve mail and wire fraud only.

17

The other three Morgan factors also militate against closed-ended continuity. Applying the second Morgan factor, courts have repeatedly found that the existence of only one victim cuts against closed-ended continuity. See e.g., CIB, 2004 WL 3119027, at *6; Meyer, 188 F. Supp. 2d at 942. Here, plaintiffs have sufficiently identified only themselves as a victim of the alleged RICO scheme.

Under the third Morgan factor, the Supreme Court has held that courts can no longer conclude that the pattern requirement has not been satisfied solely on the basis that the plaintiff alleged only one scheme, H.J., Inc., 492 U.S. at 235. The Seventh Circuit, however, has made clear that the number of schemes is still relevant to whether continuity exists. See Vicom, 20 F.3d at 782; see also Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 663 (7th Cir. 1992)(multiple acts of mail fraud occurring in a single scheme to defraud do not constitute a RICO pattern); Olive Can Co., Inc. v. Martin, 906 F.2d 1147, 1151 (7th Cir. 1990)(no pattern where single scheme involved multiple acts of mail fraud).

Plaintiffs here allege that the Kendall Defendants "engaged in a fraudulent scheme to hide the business and financial relationships and conflicts of interest between Kendall, Cobbs, and Cobbs Georgia" and to "pocket secret commissions, to procure lucrative business by fraudulently representing the scope of insurance policies, to fraudulently represent the compensation [they] received, and to fraudulently represent the [Kendall Defendants'] relationships with each other."[6] In their response to the Kendall Defendants' motion to dismiss, plaintiffs argue that the alleged

---

[6]The court notes that plaintiffs occasionally refer to "schemes," plural, but that the majority of references are in the singular.

wrongful conduct was "part of a multi-year scheme." Plaintiffs' allegations and assertions that all of the alleged wrongful conduct was in service of a single scheme argues against continuity.

The last Morgan factor is whether a RICO plaintiff has alleged non-distinct injuries. Here, plaintiffs allege only one kind of injury - economic loss - but they allege that it occurred with respect to several insurance policies and commission agreements. Although plaintiffs do not addresses whether their injuries were distinct, it could be argued that the frauds related to each policy and agreement were separate injuries. The Seventh Circuit has stated that the question is whether each of the injuries was "distinct" in the sense that it "signaled, or by itself constituted, a threat of 'continuing' criminal activity." U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc., 911 F.2d 1261, 1269 (7th Cir. 1990). Courts frequently view repeated economic injuries based on a single scheme to defraud as non-distinct.[7] For example, in Vicom, the plaintiff's allegations of multiple economic injuries - losses on multiple cancellable or potentially cancellable leases - stemmed from the same original contract and similar predicate acts. Vicom, 20 F.3d at 782. The Seventh Circuit concluded that these were not the type of injury that Congress intended to compensate under the civil provisions of RICO, and thus were not distinct. Id.; see also, Meyer, 188 F. Supp. 2d at 943(no distinct injuries when the defendant repeatedly embezzled from the plaintiff using similar predicate acts as part of a single scheme); VKS Investors v .VKS Management, Inc., 1994 WL 722035, at *4 (N.D. Ill. Dec. 29, 1994)(loss of

---

[7]The court notes that in Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1306 (7th Cit. 1987), the Seventh Circuit held that each false invoice issued as part of a single scheme constituted a separate injury. However, Liquid Air was decided prior to the Supreme Court's decision in H.J., Inc., which altered the pattern analysis, and this court is unable to identify any cases subsequent to H.J., Inc. in which the Seventh Circuit held that a pattern had been properly alleged or proved under the circumstances of Liquid Air.

money as a result of two allegedly fraudulent offerings to potential investors as part of single scheme were not distinct injuries). Similarly, the second amended complaint alleges that the Kendall Defendants developed one scheme to defraud plaintiffs, and the harms suffered were cumulative rather than independent. The final Morgan factor therefore also weighs against plaintiffs because they have failed to allege non-distinct injuries.

Accordingly, even considering the entirety of the second amended complaint, plaintiffs have failed to demonstrate either open- or closed-ended continuity, and thus have failed to show "that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." H.J., Inc., 492 U.S. at 243. As currently pled, plaintiffs fail to allege anything more than an ordinary "kickback" scheme by one company to defraud another through secret commissions and concealed business relationships. The Seventh Circuit has repeatedly emphasized that although RICO's generous civil awards are understandably tempting to plaintiffs, RICO is not a surrogate for "garden variety" fraud actions properly brought under state law. See, e.g., Midwest Grinding, 976 F.2d at 1022; U.S. Textiles, 911 F.2d at 1268. Plaintiffs have failed to state a pattern of racketeering, and the court therefore dismisses the RICO claims.

Because the court finds that plaintiffs have failed to state their civil RICO claims, it need not reach the Kendall Defendants' argument that plaintiffs' failed to plead fraud with the specificity required by Fed. R. Civ. P. 9(b). Accordingly, the Kendall Defendants' motion to dismiss Counts I and II of the second amended complaint is granted.

The remaining counts allege state law claims against the Kendall Defendants and Connecticut Specialty. Once all federal claims have been eliminated, a district court may

20

exercise its discretion to dismiss supplemental state law claims, without prejudice, and it is generally appropriate to do so. Groce v. Eli Lily & Co., 193 F.3d 496, 501 (7th Cir. 1999). There are exceptions to this general rule in "unusual cases" only, such as when substantial federal judicial resources have already been committed, or if it is abundantly clear how the state claims should be decided. Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1252 (7th Cir. 1994). Given the early stage of this case, these exceptions do not apply. Accordingly, the court declines to exercise supplemental jurisdiction over the remaining state law claims in Counts III through XI. 28 U.S.C. § 1367(c)(3). Counts III through XI are dismissed without prejudice to refiling in state court.

## CONCLUSION

For the reasons stated above, the court grants the Kendall Defendants' motion to dismiss Counts I and II, and the court declines to exercise supplemental jurisdiction over Counts III through IX. The court grants Connecticut Speciality's motion to dismiss Counts X through XI. Connecticut Specialty's motion to transfer venue is denied as moot. The complaint is dismissed.

**ENTER:**     **April 12, 2005**

Robert W. Gettleman
United States District Judge